**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CHARLES GIBSON, JR. : | |
|     Plaintiff : | |
| : | CIVIL ACTION NO. |
| v. : | 3-12-cv-583 (JCH) |
| : | |
| GEZA SCAP and : | |
| JGS PROPERTIES, LLC : | MARCH 14, 2013 |
|     Defendants. : | |

**RULING RE: DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION AND/OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT (Doc. No. 130) AND DEFENDANT'S MOTION FOR SANCTIONS (Doc. No. 133).**

## I.     INTRODUCTION

Plaintiff Charles Gibson, Jr. ("Gibson") brings this suit for breach of contract, civil fraud, and unjust enrichment against defendants Geza Scap ("Scap") and JGS Properties, LLC ("JGS"). Before the court are two motions. First, is Scap and JGS's Motion to Dismiss for Lack of Jurisdiction and/or in the Alternative Motion for Summary Judgment (Doc. No. 130). Scap and JGS argue that: (1) Gibson has failed to plead the necessary amount in controversy to establish subject matter jurisdiction under 28 U.S.C. § 1331; (2) there are no material facts to support Gibson's assertion that he entered into a partnership agreement with Scap; and (3) the Statute of Frauds bars any recovery by Gibson. Second, is Scap and JGS's Motion for Sanctions (Doc. No. 133) pursuant to Rule 11(c) of the Federal Rules of Civil Procedure. They argue that Gibson set forth "factual insufficiencies, frivolous and unfounded claims, and false material statements" in his Complaint, Motion for Contempt, and the parties' Joint Status Report. Defs.' Mot. for Sanctions at 1. For the following reasons, both Motions are denied.

## II.   STATEMENT OF FACTS

JGS is a family owned manufacturing company in Stratford, Connecticut, of which Scap is a member.  Pl.'s Local Rule (L.R.) 56(a)(2) St. at ¶ 1.  JGS took ownership of RA Lalli Company, an aerospace sheet metal and precision machine manufacturer.[1]  Id. at ¶ 2.

In October 1997, Gibson was employed by Luscombe Aircraft Corporation ("Luscombe") as a Senior Vice President for Sales, Marketing, and Customer Service. Id. at ¶ 4.  At that time, Gibson solicited Scap to become a distributor and independent sales representative for Luscombe Aircraft Corporation ("Luscombe").[2]  Defs.' L.R. 56(a)(1) St. at ¶ 3.  During August 2000, Scap entered into a regional sales representative agreement with Luscombe.  Pl.'s L.R. 56(a)(2) St. at ¶ 5.  In May 2003, Luscombe President/Chief Operating Officer John S. Daniel terminated Luscombe's sales agreements, including that of Scap.  Id. at ¶ 6.  According to Scap, the agreement was terminated due to Luscombe's allegations of Gibson's conflicts of interest and self-dealing."  Defs.' L.R. 56(a)(1) St. at ¶ 7.  According to Gibson, claims of his conflicts of interest and self-dealing were untrue.  Pl.'s L.R. 56(a)(2) St. at 7.  On May 23, 2003,

---

[1] Gibson stated in his Rule 56(a)(2) Statement that he "has no knowledge [of JGS's ownership of RA Lalli Company] and, therefore, [the statement is] Denied."  Pl.'s L.R. 56(a)(2) St. at 6.  Gibson has failed to comply with Local Rule 56(a)(2), which states that, "each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  Therefore, the court deems this assertion admitted.  See Eiden v. McCarthy, 531 F.Supp.2d 333, 338 (D. Conn. 2008) (deeming admitted defendant's L.R. 56(a)(1) statement when plaintiff's denial cited to evidence that failed to support the denial).

[2] Gibson denied this assertion, stating that, "Plaintiff was solicited by Scap's Company, Jade Aircraft, to become a sales agent for Luscombe . . . and Gibson appointed him."  Pl.'s L.R. 56(a)(2) at 7. Gibson cites to a write-up of a 2009 meeting he held with Scap to support his denial.  However, nowhere in that write-up, see Pl.'s Consolidated Ex. 1, does Gibson mention Scap's request to serve as a sales agent for Luscombe.  Therefore, defendants' statement is admitted.

2

Gibson filed suit against Luscombe in the District Court of Nevada.[3]  Defs.' L.R. 56(a)(1) St. at ¶ 8.

According to Scap, over the ensuing years, Gibson continued to offer Scap his services in "brokering certain deals."  Defs.' L.R. 56(a)(1) St. at ¶ 9.  According to Gibson, other than the deal that is at issue in this suit, the only other time he presented Scap with an investment opportunity was in May 2009.  The aviation opportunity was in Lake, Florida and entitled "Globe Fiberglas."  Pl.'s L.R. 56(a)(2) St. at ¶¶ 9-11.  The deal did not go through.  Id. at ¶ 12.

In October 2009, Scap received a notice that Quartz Mountain Aerospace, Inc. ("Quartz") was filing for Chapter 7 bankruptcy.  Id. at ¶ 13.  According to Gibson, Scap invited him to become a "joint venture partner" and acquire the Quartz assets and manufacture the aircraft in Lakeland, Florida at the former Piper Aircraft Facility.  Gibson Aff. ¶ 10.  Gibson accepted Scap's offer.  Id. at ¶ 11.  According to Gibson, they agreed that Gibson would acquire the Quartz assets and Scap would fund the venture by providing a credit facility of up to $3 million.  Id.  If any profit were earned, Gibson and Scap would split the profits 50/50.  Id.

According to Scap, he never entered into a partnership agreement with Gibson.  Defs.' L.R. 56(a)(1) at ¶ 16.  Scap asserts that Gibson—without having any authority to do so—held himself out as an agent of the partnership to third parties, including the FDIC, the Federal Aviation Administration, auctioneers, and "economic developers."  Id. at ¶ 17.  Further, according to Scap, the FDIC conducted an auction of Quartz's assets, Defs.' L.R. 56(a)(1) at ¶ 14, and on January 25, 2011, he—alone—placed a bid with the

---

[3] Gibson does not cite to evidence to contradict the defendants' assertion, but rather attempts to offer context.  As such, the court considers this statement admitted.  See Eiden, 531 F. Supp. 2d at 338.

3

FDIC agent and purchased the Quartz aircraft assets for $49,910. Id. at ¶¶ 20-21. Scap asserts that this was the only bid Scap ever submitted for this auction. Id. at ¶ 23. Scap, then, received the bill of sale from the auctioneer. Id. at ¶ 22.

However, Gibson asserts that three entities attempted to hold auctions of Quartz's assets: first, Starman Auctioneers, then Bankruptcy Trustee Janice Loyd ("Loyd"), and then the FDIC. Pl.'s L.R. 56(a)(2) at ¶ 14. According to Gibson, Scap told him that Scap bid $488,750 for the assets at the Starman auction in Oklahoma and at the auction run by Loyd, but both bids were not accepted. Id. After the Starman action, Scap informed Gibson to try to acquire the assets directly from Loyd. Id.; Gibson Aff. ¶ 20.[4] Scap also told Gibson to contact the FDIC regarding the sale of the assets. Gibson Aff. ¶ 25. After the third auction, run by the FDIC, produced no bids, Gibson negotiated a "private treaty' with the FDIC to secure the assets for $50,000. Id. at ¶ 28. Gibson directed Scap to pay $50,000 for the assets, which Scap did. Id. at ¶ 29. Gibson then prepared the bill of sale, with the auctioneer, in the name of RA Lalli. Id. at ¶ 30. On February 8, 2011, Scap received correspondence from Gibson's

---

[4] Scap and JGS argue that the court should not consider Gibson's Affidavit because the Affidavit, although signed and notarized, is not dated, as required by section 1746 of title 28 of the United States Code. Defs.' Reply at 3-4. The defendants cite to a District of Maryland case in which the court stated that, "while the absence of a date is not, in and of itself, reason to discount an affidavit or declaration, courts have typically excused that omission only where extrinsic evidence demonstrates the approximate date of signing." Brown v. White's Ferry, Inc., 280 F.R.D. 238, 244 (D. Md. 2012). Although Scap and JGS claim there is no extrinsic evidence as to when Gibson signed his Affidavit, the court disagrees. The Affidavit—which was filed with Gibson's Rule 56(a)(2) Statement—states that it is "in response to Rule 56(a)(2)." Gibson Aff. The defendants did not file their Rule 56(a)(1) Statement until January 25, 2013, see (Doc. No. 137), and the Affidavit was filed on February 18, 2013, see (Doc. No. 142). Therefore, there is evidence of an approximately three week window in which Gibson signed the Affidavit. See EEOC v. World's Finest Chocolate, Inc., 701 F.Supp. 637, (N.D. Ill. 1988) (stating that extrinsic evidence of a window of approximately two weeks during which an EEOC Charge was signed was sufficient to allow the court to validate the Charge). Furthermore, in the Second Circuit, "courts generally have exhibited a degree of flexibility in dealing with evidence used in a summary judgment proceedings [sic], particularly when the evidence has been submitted by a party opposing a motion for summary judgment." Lamoureux v. AnazaoHealthCorp., 2010 WL 3801611, at *1 (D. Conn., Sep. 22, 2010). Therefore, the court will consider Gibson's Affidavit.

representative claiming an ownership interest in the Quartz assets.[5]  Defs.' L.R. 56(a)(1) at ¶ 24.

## III.  STANDARD OF REVIEW

### A.  Motion to Dismiss Pursuant to Rule 12(b)(1)

Under Fed.R.Civ.P 12(b)(1), the court dismisses a complaint for lack of subject matter jurisdiction when it lacks constitutional authority to adjudicate the suit.  Makarova v. United States, 201 F.3d 110, 113 (2d Cir.2000).  In assessing a motion to dismiss for lack of subject matter jurisdiction, the court "accept[s] as true all material factual allegations in the complaint."  Shipping Fin. Serv. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir.1998) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  However, the court refrains from "drawing from the pleadings inferences favorable to the party asserting [jurisdiction]."  Id. (citing Norton v. Larney, 266 U.S. 511, 515 (1925)).  On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff must establish by a preponderance of the evidence that the court has subject matter jurisdiction over the complaint.  Makarova, 201 F.3d at 113; see also Malik v. Meissner, 82 F.3d 560, 562 (2d Cir.1996); In re Joint E. & So. Dist. Asbestos Litig., 14 F.3d 726, 730 (2d Cir.1993).  Courts evaluating Rule 12(b)(1) motions "may resolve the disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits."  Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir.2000).

### B.  Motion for Summary Judgment

Under Rule 12(b) of the Federal Rules of Civil Procedure, "[i]f, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted,

---

[5] Gibson denies this allegation, but his denials are non-responsive.

5

matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment . . ." Fed.R.Civ.P. 12(b). The defendants in this case filed their motion as a motion to dismiss for lack of subject matter jurisdiction or, in the alternative, as a motion for summary judgment. In so doing, they filed affidavits and a statement of facts. Gibson responded to the Motion by submitting affidavits and a statement of facts. The submission of these materials and their consideration by the court require that the Motion be deemed a Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dacourt Group, Inc. v. Babcock Indus., 747 F.Supp. 157, 159-60 (D.Conn.1990).

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d

255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

## IV. DISCUSSION

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction: Amount in Controversy

Defendants Scap and JGS argue that this court lacks subject matter jurisdiction over the case because the matter in controversy does not exceed $75,000. See Mem. in Supp. Mot. to Dismiss/Summ. J. at 9. This case is in federal court pursuant to section 1332(a) of title 28 of the United States Code—the statute conferring diversity jurisdiction to the federal courts.[6] The diversity statute confers jurisdiction "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states." 28 U.S.C. §1332(a)(1). There is no dispute that

---

[6] It should be noted that this case is in federal court because the defendants removed it from state court. See (Doc. No. 1). When pleading to the federal court that it had subject matter jurisdiction over the matter, the defendants stated that the plaintiff "has demanded in excess of the Court's jurisdictional limits of $75,000 in related damages stemming from the three (3) counts against the defendants." See Notice of Removal at ¶ 5. Yet, now the defendants argue that the case should be dismissed because the Complaint, on its face, does not meet the jurisdictional limits. Because "[t]he amount in controversy is measured . . . in the case of removal, when the case is removed to federal court," Arute v. Carnival Cruise Line Cos., 2007 WL 1114038, at *2 (D. Conn., Apr. 13, 2007), the court finds it hard to understand how the defendants could argue now that the amount in controversy is less than $75,000 when it filed a pleading saying that the jurisdictional limit was met.

7

there is complete diversity between the parties; therefore, the only dispute is regarding the amount in controversy.

"A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount." Tongkook America, Inc. v. Shipton Sportswear Co., 14 F.3d 781, 784 (2d Cir. 1994) (citing Moore v. Betit, 511 F.2d 1004, 1006 (2d Cir. 1975)). "This burden is hardly onerous, however, for we recognize 'a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy.'" Scherer v. Equitable Life Assur. Soc., 347 F.3d 394, 397 (2d Cir. 2003) (quoting Wolde-Meskel v. Vocational instruction Project Cmty. Servs., Inc., 166 F.3d 59, 63 (2d Cir. 1999)). "To overcome the face-of-the-complaint presumption, the party opposing jurisdiction must show 'to a legal certainty' that the amount recoverable does not meet the jurisdictional amount." Id. (quoting Wolde-Meskel, 166 F.3d at 63). This requires the opposing party to show that "[t]he legal impossibility of recovery . . . [is] so certain as virtually to negative the plaintiff's good faith in asserting the claim." Id. (quoting Chase Manhattan Bank, N.A. v. Am. Nat. Bank and Trust Co. of Chicago, 93 F.3d 1064, 1070-71 (2d Cir. 1996)).

Scap and JGS first claim that the face of the Complaint does not set forth an amount in controversy exceeding $75,000.[7] See Mem. in Supp. Mot. to Dismiss/Summ. J. at 10. The court disagrees. Although the Complaint alleges that "this is an action for damages that exceeds $15,000.00 and costs," Compl. ¶ 1, it also sets forth more

---

[7] Again, see supra, n.6, the court must note that the defendants filed a Notice of Removal stating that the amount in controversy is greater than $75,000. See Notice of Removal (Doc. No. 1) at ¶ 5 (stating that the plaintiff "has demanded in excess of the Court's jurisdictional limits of $75,000 in related damages stemming from the three (3) counts against the defendants.").

specific damages for each of the three counts in the amounts of $216,920.00, $433,840.00, and $433,840.00, respectively. Compl. ¶¶ 56 ,64,75. Scap and JGS next argue that Gibson failed to make a "good faith representation of the actual amount in controversy" because Gibson's calculations of his damages "are wholly without merit." Defs.' Mem. in Supp. Mot. to Dismiss/Summ. J. at 10. However, because Gibson set forth his damages in his Complaint, the court presumes that he made a good faith representation; the burden is now on Scap and JGS to show to a "legal certainty" that Gibson cannot recover more than $75,000. See Scherer, 166 F.3d at 63. Scap and JGS have failed to meet that burden.

Scap and JGS argue that, because Scap bid on and received the Quartz assets for $49,410 in January 2011, Gibson's claim can only be worth half of that amount. Defs.' Mem. in Supp. Mot. to Dismiss/Summ. J. at 10. However, Gibson claims that the assets are worth $488,750. See Compl. ¶ 65; Pl. Damages Analysis (Doc. No. 104). He reaches this valuation by claiming that Scap initially bid on the assets for that amount, Compl. ¶ 62, and that, therefore, Scap's bid reflects the actual value of the assets.[8]

Scap and JGS argue that the assets cannot be adjudged to be worth that much because "Scap never bid on the assets for $488,750." Id. However, the defendants cannot defeat subject matter jurisdiction by arguing the substance of their case. See Johnson v. Sears Roebuck & Co., 2006 WL 3618013, at *1 (D. Conn. Dec. 11, 2006) (stating that the defendants "placed the substantive cart before the jurisdictional horse"). The question of whether or not Scap actually bid on the assets for $488,750 is one for

---

[8] Gibson alleges that it was his strategy and negotiation with the FDIC that allowed Scap to obtain the assets for the significantly lower price of $49,410. See Compl. ¶¶ 35-37.

9

the jury or, possibly, this court when ruling on summary judgment, assuming that is even the measure of damages. Merely contesting Gibson's allegations does not show to a legal certainty that Gibson cannot recover more than $75,000. See Scherer, 166 F.3d at 63. "If the right of recovery is uncertain, the doubt should be resolved . . . in favor of the subjective good faith of the plaintiff." Tongkook, at 785-86 (quoting McDonald v. Patton, 240 F.2d, 424, 426 (4th Cir. 1957).

Furthermore, Gibson has introduced additional supporting evidence to suggest the assets were worth more than $49,410. See Arute, 2007 WL 1114038, at *2 (stating that the Second Circuit allows courts to look outside the pleadings to other evidence in the record when the pleadings themselves are inconclusive as to the amount in controversy). Attached to his Rule 56(a)(2) statement, he included an email exchange with the auctioneer, in which the auctioneer stated that the assets were appraised at $300,000. See Consolidated Ex. 11. Gibson also attached evidence that there were buyers interested in purchasing the assets from Gibson and Scap. See Seaver Aff. ¶ 5; see also Consolidated Ex. 8. Therefore, to the extent that Gibson claims that he suffered damage—in the form of lost profits[9]—when Scap breached their oral partnership agreement, Gibson has introduced evidence to suggest that lost profits exceeded $75,000. Scap and JGS have not introduced any evidence to suggest otherwise. Because Scap and JGS have failed to show to a legal certainty that Gibson cannot recover damages greater than $75,000, their Motion to Dismiss for Lack of Jurisdiction is denied.

---

[9] In his Complaint, Gibson alleges that Scap informed him that "he wished to sell all of the QMA [Quartz] assets, retain no interest, and that any profit would be split 50/50." Compl. ¶ 42.

10

B.  Summary Judgment

Scap and JGS argue that the court should grant summary judgment in their favor for two reasons: (1) the Statute of Frauds bars recovery; and (2) the undisputed facts show that Gibson and Scap never entered into a partnership agreement.  The court will consider each argument in turn.

    1.  Statute of Frauds

Scap and JGS argue that Gibson's claims—for breach of an oral contract and other counts stemming from the oral contract—are barred by the Statute of Frauds.  Defs.' Mem. in Supp. Mot. to Dismiss/Summ. J. at 14.  Section 52-550(a) of the Connecticut General Statutes provides that, "[n]o civil action may be maintained . . . unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . upon any agreement that is not to be performed within one year from the making thereof."  Conn. Gen. Stat. § 52-550(a).  Scap and JGS argue that the alleged agreement with Gibson—to reestablish and continue the manufacturing of the QMA 11ER and QMA 11A aircraft for profit—involved a complex business enterprise that, by its very nature, would extend for more than a year.  Defs.' Mem. in Supp. Mot. to Dismiss/Summ. J. at 14-15.

The Supreme Court of Connecticut has held that, "the enforceability of a contract under the one year provision [of the Statute of Frauds] does not turn on the actual course of subsequent events, nor on the expectations of the parties as to probabilities. Contracts of uncertain duration are simply excluded [from the Statute of Frauds]; the provision covers only those contracts whose performance cannot possibly be completed within a year."  Finley v. Aetna Life and Cas. Co., 202 Conn. 190, 213 (1987) (overruled

on other grounds).  In interpreting what it means for a contract to not possibly be able to be performed within a year, the Supreme Court of Connecticut further clarified that the Statute of Frauds only encompasses "contracts whose completion within a year would be inconsistent with the express terms of the contract."  <u>C.R. Klewin, Inc. v. Flagship Properties, Inc.</u>, 220 Conn. 569, 580 (1991).  Even if the parties expected the contract to continue for more than a year, or if it was improbable that the contract would last less than a year, unless there was a "stipulation which in terms, or by reasonable inference, required" the contract to be performed over a period of time greater than a year, the Statute of Frauds does not apply.  <u>Id.</u> at 582 (stating that, "[t]he question is not what the probable, or expected, or actual performance of the contract was; but whether the contract, <u>according to the reasonable interpretation of its terms</u>, required that it should not be performed within the year").

Scap and JGS merely argue that the nature of the business partnership at issue—acquiring airplane assets to manufacture planes—was one which would take a significant amount of time to perform.  Defs.' Mem. in Supp. Mot. to Dismiss/Summ. J. at 14.  This is an argument regarding the <u>expected</u> or <u>probable</u> performance of the agreement.  Scap and JGS do not cite to any evidence to suggest that the oral agreement included terms which <u>required</u> that the agreement should not be performed within the year.  In fact, Gibson has presented evidence that the parties could very well have intended the agreement to be performed within the year, as—according to Gibson—the parties were in negotiations with a potential buyer who would purchase the assets from Gibson and Scap.

### 2. Whether Gibson and Scap entered into a partnership agreement

Scap and JGS argue that Gibson has failed to raise facts which would allow a reasonable jury to find that he entered into a partnership agreement with Scap and that, therefore, all of his claims fail.  See Defs.' Mem. in Supp. Mot. to Dismiss/Summ. J. at 11.  First, it is unclear from Gibson's allegations and the evidence as to whether he claims that he and Scap entered into a partnership agreement or a joint venture agreement.  See Consolidated Ex. 3 (in which Gibson states he is a "joint venture partner").

The Connecticut legislature has adopted and codified the Uniform Partnership Act, which states that, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership."  Conn. Gen. Stat. § 34-314. "In determining whether a partnership is formed . . . [a] person who received a share of the profits of a business is presumed to be a partner in the business . . ."  See Lenoble v. Best Temps., Inc., 352 F.Supp.2d 237, 249 (D. Conn. 2005) (citing Conn. Gen. Stat. § 34-314).  In addition, "a mutual agency relationship is [generally] an essential element of a partnership."  Id. (citing Davies v. General Tours, Inc., 63 Conn. App. 17, 20 (2001).

Meanwhile, "[a] joint venture . . . exists where two or more parties combine their property, money, efforts, skill or knowledge in some common undertaking . . . The relationship between contracting parties cannot amount to a joint venture unless the parties so intend [and] . . . joint ventures relate to a single transaction, whereas partnerships exist for a general business."  Davies v. General Tours, Inc., 63 Conn. App. 17, 29 (2001).  "A joint venture requires five elements, namely two or more

13

persons must enter into a specific agreement to carry on an enterprise for profit; their agreement must evidence their intent to be joint venturers; each must make a contribution of property, financing, skill, knowledge, or effort; each must have some degree of joint control over the venture; and there must be a provision for the sharing of both profits and losses." Schlierf v. Abercrombie & Kent. Inc., 2011 WL 2418571, at *6 (Conn. Super. May 19, 2011).

Joint ventures are generally governed by the same principles as partnerships. Doe v. Yale University, 252 Conn. 641, 672 (2000). However, "[g]enerally, joint ventures relate to a single transaction, whereas partnerships exist for a general business." Id. In addition, "although mutual agency is required in order to have a partnership; it is not required for the existence of a joint venture." Id. (internal citations omitted).

In determining whether the parties entered into a binding agreement, "all the essential terms must have been agreed upon," although all the terms of a contract do not need to be present. Aruba Hotel Enterprises v. Belfonti, MCR Property Management, Inc., 611 F.Supp.2d 203, 209 (D. Conn. 2009) (citing Glazer v. Dress Barn, Inc., 274 Conn. 33 (Conn. 2005)). If there are no terms, the intent of the parties is paramount. Id.

Scap and JGS argue that Gibson's February 7, 2011 email to Scap—in which he requests confirmation that, if they were to sell all or part of the Quartz assets, they would split the profits fifty-fifty—and Scap's negative response—he stated that, "not only is this not a confirmation [but] please be advised that as of this date I expect you to cease telling parties that you are a representative of this venture"—show that the two

had never entered into an agreement to share profits and enter into a partnership. Defs.' Mem. in Supp. Mot. to Dismiss/Summ. J. at 13.  It appears that Scap and JGS are arguing that, any prior agreement the two allegedly entered into regarding the partnership (or joint venture), could not constitute a binding agreement as the essential terms were unclear or indefinite, as evidenced by Gibson's need to confirm their profit-sharing arrangement in his February 7, 2011 email.  Id.

However, Gibson has introduced conflicting evidence which would allow a reasonable jury to find that the parties entered into a partnership or joint venture agreement.  According to Gibson, Scap invited him to become a "joint venture partner with him in an attempt to acquire the QMA Assets and start manufacturing the aircraft." Gibson Aff. ¶ 10.  On November 12, 2009, Gibson accepted Scap's offer.  Id. at ¶ 11; see also Consolidated Ex. 3 at 1 (stating in a letter to Scap that, "I have given serious thought to your JV proposal and I am writing to inform you that I am in!").  The letter in which Gibson accepts the offer states that, Scap will "put in the money and  . . . [Gibson] will put in [his] knowledge and experience and we will split anything we might make." Consolidated Ex. 3 at 2.  Gibson's notes from a meeting he had with Scap, dated December 7, 2009, state that, "[i]f we were successful in getting QMA, I would be responsible for putting the deal together and Geza [Scap] would provide the funding. We would be 50/50 in the deal.  He would charge 1/2 a point above his cost to the partnership and take the bank out first.  I would be compensated like at QMA for managing the deal on a part or perhaps even a full [time] basis."[10]  Consolidated Ex. 1.

---

[10] Scap and JGS argue that there are "repeated and blatant inconsistencies between the positions advanced by Gibson" because he has made claims that he would both share the profits with Scap within a partnership and that he would be employed by the new partnership.  See Mem. in Supp.

Later letters and email exchanges evidence Gibson contacting the auctioneers regarding the various bids—on behalf of the partnership—on the Quartz assets.  See Consolidated Ex. 2; 8; 10.  Although Scap claims that he never proposed that the two parties enter into an agreement and that Gibson did not have authority to present himself as a representative of the venture, whether that is true is an issue for the jury to decide, as there are disputes of material fact which foreclose summary judgment.  Therefore, Scap and JGS's Motion for Summary Judgment is denied.

    C. Motion for Sanctions

Scap and JGS request sanctions be issued against Gibson, pursuant to Rule 11(b) of the Federal Rules of Civil Procedure, "for his factual insufficiencies, frivolous and unfounded claims, and false material statements" as set forth in his Complaint, Motion for Contempt, and the Joint Status Report.[11]  Defs.' Mot. for Sanctions at 1.  First, as to Scap and JGS's contention that Gibson's claims are frivolous and that his factual contentions have no evidentiary support, the court disagrees as Gibson's claims have survived summary judgment.  Second, with respect to any facts set forth in the Motion for Contempt and Joint Status Report, any factual misrepresentations that occurred do not rise to the level of sanctionable conduct.  The court directs both parties in the future to be more careful in what they represent to the court.

---

Mot. to Dismiss/Summ. J. at 8 (citing Compl. ¶ 9).  Although the terminology Gibson uses may be inconsistent, he has introduced evidence which raises a disputed issue of material fact as to whether he entered into a partnership or joint venture agreement with Scap.

    [11] Scap and JGS also argue as to Gibson's representation in his opposition to defendants' Motion for Sanctions that he never received the defendants' Notice of Defect and Motion for Sanctions.  Scap and JGS introduced a return receipt from Gibson's office, signed by an S. Adriana, which they state included the Notice.  See Reply at 2; Ex. A.  Because another individual signed for the package, the court cannot determine that Gibson's claim that he never received the package was made in bad faith.  Similarly, the court cannot find that Scap and JGS failed to comply with the Safe Harbor Provision of Rule 11—which requires the party intending to file a motion for sanctions to serve the motion on the opposing party so as to give the party time to fix any error before resorting to involvement by the court—as Scap and JGS have submitted evidence that they sent the package via mail.

## V.  CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss for Lack of Jurisdiction and/or in the Alternative, Motion for Summary Judgment (Doc. No. 130) and the defendants' Motion for Sanctions (Doc. No. 133) are **DENIED**.

**SO ORDERED.**

Dated at New Haven, Connecticut, this 14th day of March, 2013.

                                              /s/ Janet C. Hall
                                              Janet C. Hall
                                       United States District Judge